### BLUMENTHAL et al. v. MICHEL et al.

(Supreme Court, Appellate Division, First Department. October 21, 1898.)

**1. FRAUDULENT TRANSFER.**

A transfer of a stock of millinery to a creditor on the eve of the debtor's failure is not fraudulent merely because the creditor employed the debtor and his family in manufacturing and selling the stock, and, finding the expenses were too large, sold the balance of the stock to the debtor's son for an adequate consideration.

**2. SAME—INDEBTEDNESS.**

Where one bought out his wife's business, and they treated the lease as assigned to him, except that the landlord would not let it be put in his name, money afterwards paid, in consideration of his moving out, so a new building could be erected, and which he used in his business, cannot constitute a basis of indebtedness, so as to support a transfer of property to her against his creditors.

**3. SAME—AIDING DEBTOR.**

A transfer of property to a creditor will be held fraudulent where he at the same time endeavors to hold property for the debtor, to keep it for him from his creditors.

Appeal from special term.

Action by Ferdinand M. Blumenthal and others against Moses Michel and others. From judgment for plaintiffs after trial, defendants appeal. Reversed in part.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

E. C. James, for appellants.

Alexander Blumenstiel, for respondents.

VAN BRUNT, P. J. This action was brought by judgment creditors of one Moses Michel to set aside various transfers made by him upon the eve of his failure. In 1877 the defendant Moses Michel failed in business. After his failure, Eva Michel, his wife, began the millinery business. He acted as her salesman and manager until 1889, when he went into business for himself. On the 25th of April, 1893, Moses Michel sold all his merchandise and fixtures to the defendants Zeimer & Feldstein (who were his creditors to the amount of $13,000) for the sum of $7,762.80, which sum was to be applied as part payment of this indebtedness. He transferred to the defendants Miller Bros. about $13,500 of accounts as security for his indebtedness to them, and made a transfer to his wife of bills receivable of the face value of $5,000 in part payment of his indebtedness to her. These transfers are attacked in this case, it being claimed that they were made with intent to hinder, delay, and defraud the creditors of Moses Michel.

The first transfer which it is necessary to examine is that to Zeimer & Feldstein, of the stock and fixtures. The fact that Zeimer & Feldstein were creditors of Moses Michel to a large amount is not

disputed; nor is it claimed that the stock sold to them was worth more than the sum which they paid for the same. But it is urged that, in connection with the other transfers, and the method which they pursued in reference to the stock and fixtures bought by them, the court below was justified in concluding that this transfer was part and parcel of the general scheme of Moses Michel to defraud his creditors. It appears from the evidence that this sale was negotiated with Samuel Zeimer, the senior member of the firm, upon the eve of his departure for Europe; and that, immediately upon the transfer being effected, he started for Europe, leaving the matter in the hands of his nephew, Walter Zeimer. It further appears that Zeimer & Feldstein immediately put up their name, placed their bookkeeper in charge of the stock of goods, and proceeded to manufacture the same, so that they might be sold. All proceeds of sale were received by their employés, and taken possession of by them. It is true that they employed in the manufacture and sale of this merchandise the Michels for various times, and for various purposes. Eva Michel, the wife, was used for two or three weeks for a packer; Moses Michel was sent upon the road for a short period; Max Michel, a son of Moses, was engaged to superintend the manufacture of stock, with which he was thoroughly familiar; Aaron Michel, another son, was engaged as general stock clerk, and to attend to sales in the store when necessary; and Aaron Michel, a nephew, was employed as city salesman for three or four weeks. There was no attempt to carry on the business except to manufacture and sell the stock which was bought. No additions of any consequence were made to this stock, and the sole effort of Zeimer & Feldstein seems to have been to dispose of this stock, and to save as much for themselves as possible. Samuel Zeimer came back from Europe in the latter part of June, and found that the sale of the goods was progressing slowly, and at great expense, there having been sold goods to the amount of about $4,437 at an expense of $2,392. Max Michel then offered to buy from Zeimer & Feldstein the balance of the stock at a valuation, which valuation is not impeached, namely, $3,723.62, paying $723.62 in cash, and the balance in six notes of $500 each, two payable in six, two in twelve, and two in eighteen months from date; all of which notes were duly paid at maturity. It is claimed that these facts justified the court in holding that Zeimer & Feldstein took the stock simply for the purpose of keeping it out of the hands of the creditors of Moses Michel, and of finally returning it to him in the name of Max Michel. No such conclusion can be legitimately drawn from the facts above stated, and there is no proof that Zeimer & Feldstein had any knowledge of any of the other circumstances to which allusion will hereafter be made attending the failure of Moses Michel. Zeimer & Feldstein had a right to secure their debt, if possible, by the purchase of this stock and fixtures. They attempted to dispose of them for the purpose of liquidating a portion of their indebtedness. There was no attempt to continue the business. No goods were bought. Simply the expenses of sale and of putting some of the goods in condition for sale were incurred by them. It had been proved by their experience during the time in which they were

seeking to dispose of these goods that it was an expensive undertaking; and upon Samuel Zeimer's return they were sold to Max Michel for a consideration, which is admitted to be adequate, and which has been paid.   We think, therefore, that the learned court below erred in holding that the transfer to Zeimer & Feldstein was, in any respect, tainted with fraud.

The transfer of the bills receivable to Eva Michel, and of the open accounts to Miller Bros., stand upon an entirely different footing. Although it is conceded that a bona fide indebtedness in excess of the value of the amounts received by Miller Bros. existed in their favor, the indebtedness to the wife, Eva Michel, is successfully challenged, and it is because of the dealings of Miller Bros. in respect to this alleged indebtedness to Eva Michel, and to an equally mythical indebtedness to Max Michel, that the conclusion is irresistible that they were aiding and abetting Moses Michel in secreting his property from his creditors, and thus defrauding them.   The alleged indebtedness of Eva Michel consisted of a sum of $6,500 received by Moses Michel from the sale of a lease owned by Eva Michel, of a sum of $1,875 for money loaned arising out of the earnings of Eva Michel while she worked for her husband from 1889 to 1893, and of a sum of $900 for money loaned by Eva Michel, having been drawn by her from her account in the East River Savings Bank; the total aggregating $9,275.   The alleged indebtedness for $6,500 under the lease transaction seems to have arisen as follows:   In January, 1889, the defendant Eva Michel, being then in business in her own name, took a lease of the premises 30 West Houston street.   When her husband took the business from her in his own name, both he and his wife desired to have this lease put in his name.   The landlord would not consent to this, but insisted on Mrs. Michel keeping the lease in her own name; Mr. Michel, however, treating the lease as his own, occupying the premises, and paying the rent therefor.   In 1891, a person desiring to build next door found it necessary to get possession of the premises occupied by Moses Michel under the lease in his wife's name, and offered $8,500 for its surrender or assignment, and Moses Michel says there was paid to him $6,500 to get out.   Mrs. Michel says that she received the money, and handed it over to her husband, who put it in his business.   It is manifest that subsequent to the time of Moses Michel taking possession of the business both he and his wife, as between themselves, considered this lease as belonging to him; and it was only because it stood in her name that she had anything whatever to do with the transaction of its surrender.   As Moses Michel says, he took the money, and put it in his business. The item of $1,875, money loaned arising out of the earnings of Eva Michel while she worked for her husband from 1889 to 1893, is even more shadowy than the claim in regard to the lease.   She says that she worked for her husband for $25 a week; that he was accustomed to put the money in his safe, in envelopes directed to her, and when it came to a considerable amount he would substitute a check; that occasionally she got some money; and that when Moses Michel was in want of money he would take these checks, and use them, without in any way consulting Mrs. Michel, and treating the money as his

own. Now, it is clear that this money was never placed under the dominion of Mrs. Michel. Moses Michel had control of it the whole time, and used it just as he wanted to. This, of itself, would show that there had been no such dominion given over this money as transferred the title of it to Mrs. Michel. It was in his safe, and under his control; he doing with it what he pleased. It is rather remarkable, too, that Mrs. Michel, after Moses Michel transferred this stock and fixtures to Zeimer & Feldstein, should do the same character of work for Zeimer & Feldstein for $9 a week for which she had been paid $25 a week by her husband. When Moses Michel came to fail, he claims to have transferred $5,000 of his bills receivable to apply on account of this indebtedness. How was that done? The bills receivable were not given to Mrs. Michel, but were taken by Moses Michel to Miller Bros., and deposited with them, with instructions that they should collect the same on behalf of Mrs. Michel. Miller Bros. collected this money, and handed it over to Moses Michel. It may be true that the checks were drawn to the order of Eva Michel, and were indorsed by her; but it is conceded that Moses Michel got the money, that he received the checks from Miller Bros., and that the money went into the business which he was then carrying on under the name of Max Michel. No other conclusion is to be arrived at than that this indebtedness was conjured up for the purpose of protecting the property of Moses Michel from his creditors.

We next come to the transfer to Miller Bros. As already stated, there is no claim but that Moses Michel was indebted to Miller Bros. in a sum exceeding the amount of the accounts transferred to them in alleged payment of this indebtedness, and, if that were all, undoubtedly the transfer could be sustained. But it appears from the evidence that Miller Bros. were the bankers for the purpose of holding the property of Moses Michel, and protecting it from the creditors. In addition to the $5,000 of bills receivable, we find them receiving sums of money deposited with them by Max Michel, which undoubtedly were taken out of this business in anticipation of the failure. Max Michel's story in regard to his keeping part of his money in the safe, the same as his mother, and part in a wooden box upon his wardrobe, is incredible. According to his story, these were savings from his salary for years, and it is difficult to see why he should not have continued to use the depository in which he had kept his money so long in his wardrobe simply because his father had failed. The money alleged to have been in the safe was brought by Moses Michel to Miller Bros. to be placed to the credit of his son. We have already called attention to the fact that he had brought $5,000 in notes to be placed to the credit of his wife. Now he brings a lot of money to be placed to the credit of his son. Miller Bros. received these notes and moneys, and subsequently paid them all over to Moses Michel. There seems to be but one conclusion to be drawn from this state of facts, and that is that Miller Bros. were holding this property of Moses Michel to keep it out of the reach of his creditors, and that this form of making checks payable to the wife and son was simply part of the scheme, it appearing clearly that all the money

went into the business which Moses Michel was carrying on in the name of his son.

We think, therefore, that the judgment so far as it set aside the transfers to Eva Michel and to Miller Bros. should be affirmed, with costs as against the defendants Eva Michel and Miller Bros.; and that so far as it set aside the transfer to Zeimer & Feldstein it should be reversed, and a new trial ordered, with costs to appellant to abide the event. All concur.